1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9              **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    ERNEST E. CLARK, IV,                    No. CIV S-08-0163-CMK-P

12                  Petitioner,

13          vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14    TONY HEDGEPETH,

15                  Respondent.

16    _____/

17              Petitioner, a state prisoner proceeding pro se, brings this petition for a writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254.  Pursuant to the written consent of all parties

19    appearing in the action, this case is before the undersigned as the presiding judge for all purposes,

20    including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending before the court are

21    petitioner's amended petition for a writ of habeas corpus (Doc. 9), respondent's answer (Doc.

22    23), and petitioner's reply (Doc. 27).

23    / / /

24    / / /

25    / / /

26    / / /

1

# I. BACKGROUND

A.   **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> While driving under the influence of methamphetamine, defendant Ernest Erastus Clark, IV, caused a head-on collision resulting in serious bodily injury.  One year later, again while driving under the influence of methamphetamine, he caused another head-on collision, this time killing two people and seriously injuring another.
>
> * * *
>
> A.  July 6, 2002, Collision
>
> On July 6, 2002, at about 4:00 p.m., defendant drove a pickup truck onto Highway 50 at Watt Avenue going eastbound.  Driving in excess of eighty-five miles per hour, he cut in front of one vehicle and swerved back and forth without signaling.  He then crossed all eastbound lanes, and almost struck the guardrail but made a corrective action and drove along the shoulder for a brief period, still traveling over eighty-five miles per hour.  He then swerved back across five lanes of traffic, missed the Bradshaw Road exit, jumped a nearby embankment where he crashed though a cyclone fence, and headed eastbound on Micron Road.
>
> Meanwhile, Hugh Estes was traveling northbound on Bradshaw Road in his pickup truck.  As Estes turned onto Bradshaw Road between Florin Road and the Jackson Highway, he saw defendant's pickup truck coming straight towards him.  Defendant's truck was moving at an excessive speed and he made no effort to move back into the southbound lane.  Surrounded by a ditch on one side and traffic all around him, Estes could not avoid the collision.  The impact shattered his windshield, lodging glass in his eye, and causing the steering wheel to hit him in the chest.  Estes was later transported by ambulance to the intensive care unit of a nearby hospital where he was released the following day.  Two weeks later, he underwent eye surgery to repair the damage caused by the glass.
>
> Defendant was also transported to the hospital where a blood sample was drawn from him.  He was treated for his injuries, which included punctured lungs and a broken leg.

/ / /

> B.  Collision on July 20, 2003

---

[1]   Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as "defendant."

One year later, on July 20, 2003, at approximately 12:00 p.m., Lavonne Gibson was driving northbound on Highway 160, a divided highway in Sacramento County, with three lanes in both directions. As she headed down the off-ramp onto Del Paso Boulevard, defendant entered the same off-ramp going the wrong direction. He was traveling at seventy or eighty miles an hour and she was forced to pull to the side to avoid being hit. Defendant took no evasive action.

He continued driving southbound against northbound traffic and passed another driver who was traveling in another lane. Shortly thereafter, his vehicle collided head on with a Honda Accord. The driver of the Accord, Ann Odell, was declared dead at the scene. Her head had been disconnected from her spine. After hitting the Accord, defendant's [Acura] truck struck a Lincoln Town Car driven by Lesley Kibby. Kibby was driving northbound with her eighty-one-year-old mother Ruth Ann Watkins. Kibby was pried out of her car with the "jaws of life" and taken to the hospital. Her arm was broken and she was hospitalized for seven weeks.

Kibby's mother, Ruth Watkins, was admitted to the hospital and diagnosed with multiple rib fractures and a closed head injury. While in the hospital, she developed several complications and died on August 15, 2003. The pathologist concluded that the blunt force injuries she sustained in the collision aggravated her underlying medical problems and led to her death.

Defendant was unable to answer coherently the paramedics' questions, although he told the officer his name was Ernie. He was transferred to the medical center, placed under arrest for driving under the influence, and a blood sample was taken from him. His lower right leg was amputated as a result of injuries he sustained in the collision. Upon discharge, he was taken into custody and advised of his *Miranda*₅₎ rights. He agreed to answer questions and claimed he had no recollection of the collision, but admitted he was a drug addict and frequent user of methamphetamine.

A highway patrol officer trained in accident reconstruction confirmed that the Acura and the Accord were in the northbound number one lane traveling in opposite directions when they both swerved into the number two lane and collided with each other. The Acura pushed the Accord across the road where the two vehicles collided with the Lincoln. The Acura was traveling at an estimated speed of at least 71.8 miles per hour when it hit the Accord and no skid marks attributable to the Acura were found.

## C.  Prior Driving History

Defendant's girlfriend, his stepfather, and two of his brothers testified that when they drove with defendant, he would weave in and out of traffic, cut people off, and drive too fast. They warned him to drive more carefully and to slow down.

/ / /

## D.  Expert Testimony Regarding the Blood Test Results

3

The criminalist who analyzed defendant's blood samples found that the blood drawn on July 6, 2002, contained .02 milligrams per liter of amphetamine and .20 milligrams per liter of methamphetamine.  The blood drawn on July 20, 2003, contained .03 milligrams per liter of amphetamine and .43 milligrams per liter of methamphetamine.

Barry Logan, a toxicologist, testified that methamphetamine is a highly addictive drug that operates as a central nervous system stimulant, which generally affects the processes or pathways in the brain responsible for making decisions and carrying out actions as a result of those decisions. The drug produces an array of effects as it works its way through the body. Initially after ingesting the drug, people feel euphoric, energetic and good about themselves, their perception of their capabilities and abilities are enhanced, and they are often alert, restless and agitated. They also overestimate their ability to perform certain tasks, resulting in aggressive and risk-taking behavior.

After the initial feeling wears off, the user moves into the second phase, referred to as "tweaking."  This occurs after the drug has been administered for a period of time and the brain starts to develop some tolerance to the affects of the drug.  When it is readministered, people feel restless and agitated.  This phase is characterized by irritability, anxiety, agitation, and paranoia.  The next phase is called the "crash phrase."  As usage progresses over a period of time during a binge, a person experiences some depression, low energy, inattention, preoccupation, and fatigue from lack of sleep, which may cause the person to sleep for a long period of time during this phase.

Logan testified that driving under the influence of methamphetamine is very dangerous and the blood methamphetamine level of a driver impaired by methamphetamine is usually .2 or .3 milligrams of methamphetamine per liter of blood.  Those who sustain fatal injuries have an average concentration of .35 milligrams per liter of blood.

A driver who has used methamphetamine and is in the early phase of the drug will engage in speeding and reckless driving.  A driver who is in the crash phase of the drug, may be inattentive or fall asleep at the wheel, causing him or her to drive off the road or drift across lanes without making any corrective action.  Logan therefore concluded that because of all the behaviors associated with the three stages of recreational use, methamphetamine affects a persons' ability to drive when he or she is under the influence of the drug and that person's ability to drive safely is impaired.  Logan further concluded that defendant was driving under the influence of methamphetamine when he collided with Estes' truck on July 6, 2002, and at the time of the fatal collision on July 20, 2003.

E.  Defense

Defendant did not testify but called two witnesses to present a mental impairment defense.  His mother, Bonnie Wright, testified about his early childhood developmental problems and his methamphetamine addiction.  He did not talk until he was three years old, he was slow in school, held back in the second grade, and at age ten, was placed in special education classes and speech therapy.  In 1999, when he was eighteen years old, he spent a year in a residential treatment facility for drug

4

addiction, which seemed to help him, attended Narcotics Anonymous (NA) meetings after he was released from the facility, and obtained his GED. However, he had a relapse in the summer of 2000 and rejected efforts to help him.  At that time, the defendant told his mother he did not think he had a problem and that he would quit using "speed."

Dr. John Wicks, a clinical neuropsychologist, testified that defendant had problems with verbal expression, reading, learning, and memory.  Dr. Wicks diagnosed him with attention deficit disorder and also concluded that with respect to abstract reasoning and judgment, defendant was borderline retarded and had an IQ of 80, which placed him in the low normal range of intelligence.

**B.    Procedural History**

Petitioner was convicted following a jury trial of two counts of second degree murder, two counts of driving under the influence of a drug and neglecting a duty imposed by law which caused bodily injury, and one count of misdemeanor hit and run.  The jury found true the allegation that petitioner caused death to more than one victim.  Petitioner was sentenced to an aggregate term of 32 years to life in state prison, plus eight months.  The conviction and sentence were affirmed on direct appeal in a reasoned decision issued by the California Court of Appeal.  The California Supreme Court denied direct review and petitioner did not seek certiorari.

Petitioner filed a habeas petition in the California Court of Appeal, which was denied with a citation to In re Steele, 32 Cal. 4th 682, 692 (2004).  A second habeas petition filed in the California Court of Appeal was denied with citations to In re Steele, and In re Hillary, 202 Cal. App. 2d 293 (1962).  Petitioner filed a third habeas petition in the California Supreme Court, which he later amended to include all the claims raised in the instant federal petition.  The California Supreme Court denied relief without comment or citation.

Respondent concedes petitioner's claims are exhausted.

/ / /

/ / /

## II.  STANDARDS OF REVIEW

1          Because this action was filed after April 26, 1996, the provisions of the

2    Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.

3    See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler),

4    128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not,

5    however, apply in all circumstances.  When it is clear that a state court has not reached the merits

6    of a petitioner's claim, because it was not raised in state court or because the court denied it on

7    procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court

8    must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding

9    that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's

10   claim under its "re-litigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002)

11   (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA

12   did not apply because evidence of the perjury was adduced only at the evidentiary hearing in

13   federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo

14   where state court had issued a ruling on the merits of a related claim, but not the claim alleged

15   by petitioner).  When the state court does not reach the merits of a claim, "concerns about

16   comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

17         Where AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is

18   not available for any claim decided on the merits in state court proceedings unless the state

19   court's adjudication of the claim:

20                  (1) resulted in a decision that was contrary to, or involved an
                unreasonable application of, clearly established Federal law, as determined
21              by the Supreme Court of the United States; or

22                  (2) resulted in a decision that was based on an unreasonable
                determination of the facts in light of the evidence presented in the State
23              court proceeding.

24   28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

25   Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).  Thus,

26   under § 2254(d), federal habeas relief is available only where the state court's decision is

1   "contrary to" or represents an "unreasonable application of" clearly established law.  Under both

2   standards, "clearly established law" means those holdings of the United States Supreme Court as

3   of the time of the relevant state court decision.  See Carey v. Musladin, 127 S.Ct. 649, 653-54

4   (2006).  "What matters are the holdings of the Supreme Court, not the holdings of lower federal

5   courts."  Plumlee v. Masto, 512 F.3d 1204 (9th Cir. Jan. 17, 2008) (en banc).  Supreme Court

6   precedent is not clearly established law, and therefore federal habeas relief is unavailable, unless it

7   "squarely addresses" an issue.  See Moses v. Payne, ___ F.3d ___ (9th Cir. Sept. 15, 2008)

8   (citing Wright v. Van Patten, 128 S.Ct. 743, 746 (2008)).  For federal law to be clearly

9   established, the Supreme Court must provide a "categorical answer" to the question before the

10  state court.  See id.; see also Carey, 127 S.Ct at 654 (holding that a state court's decision that a

11  defendant was not prejudiced by spectators' conduct at trial was not contrary to, or an

12  unreasonable application of, the Supreme Court's test for determining prejudice created by state

13  conduct at trial because the Court had never applied the test to spectators' conduct).  Circuit

14  court precedent may not be used to fill open questions in the Supreme Court's holdings.  See

15  Carey, 127 S.Ct. at 653.

16          In Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a

17  majority of the Court), the United States Supreme Court explained these different standards.  A

18  state court decision is "contrary to" Supreme Court precedent if it is opposite to that reached by

19  the Supreme Court on the same question of law, or if the state court decides the case differently

20  than the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

21  court decision is also "contrary to" established law if it applies a rule which contradicts the

22  governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

23  that Supreme Court precedent requires a contrary outcome because the state court applied the

24  wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

25  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

26  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

1   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

2   1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

3   case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is

4   whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

5          State court decisions are reviewed under the far more deferential "unreasonable

6   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

7   unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

8   123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

9   suggested that federal habeas relief may be available under this standard where the state court

10  either unreasonably extends a legal principle to a new context where it should not apply, or

11  unreasonably refuses to extend that principle to a new context where it should apply.  See

12  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

13  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

14  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

15  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found

16  even where the federal habeas court concludes that the state court decision is clearly erroneous.

17  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper

18  deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As

19  with state court decisions which are "contrary to" established federal law, where a state court

20  decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

21  unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

22  / / /

23  / / /

24  / / /

25          The "unreasonable application of" standard also applies where the state court

26  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

848, 853 (9th Cir. 2003); <u>Delgado v. Lewis</u>, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  <u>See</u> <u>Green v. Lambert</u>, 288 F.3d 1081 1089 (9th Cir. 2002); <u>Delgado</u>, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law. <u>See</u> <u>Himes</u>, 336 F.3d at 853; <u>Delgado</u>, 233 F.3d at 982.

### III.  DISCUSSION

In his amended petition, petitioner raises the following claims:

| | | |
|---|---|---|
| Ground 1 | Claims relating to jury deliberations: | |
| | A.  The trial court interrupted crucial deliberations; | |
| | B.  The jury separated without permission after deliberations began, leaving one juror alone and unsupervised; | |
| | C.  The trial court failed to discharge the jury and order a new trial when one juror refused to re-enter the court with the other jurors for the reading of the verdicts; | |
| | D.  The trial court failed to admonish the jury before it adjourned not to converse among themselves or with non-jurors about the case; | |
| | E.  There is a "real possibility" all jurors did not participate in deliberations on September 30, 2004; and | |
| | F.  Trial counsel was ineffective for failing to object to jury problems outlined above. | |
| Ground 2 | Juror misconduct. | |
| Ground 3 | Claims relating to jury instructions: | |
| | A.  Erroneous jury instruction regarding implied malice; and | |
| | B.  Trial counsel was ineffective for failing to object to the implied malice instruction. | |
| Ground 4 | Insufficient evidence of implied malice. | |
| Ground 5 | Insufficient evidence petitioner's conduct caused Ruth Watkins' death. | |

| | | |
|---|---|---|
| Ground 6 | Claims of ineffective assistance of counsel relating to Watkins' death: | |
| | A.  Trial counsel failed to present evidence regarding Watkins' pre-existing conditions and lack of treatment; | |
| | B.  Trial counsel failed to consult an expert to determine the cause of Watkins' death; | |
| | C.  Trial counsel failed to request that the jury instruction regarding causation be supplemented with instructions regarding supervening causes of death and inadequate treatment; and | |
| | D.  Trial counsel failed to adequately argue issues related to the cause of Watkins' death during closing argument. | |
| Ground 7 | Sentence constitutes cruel and unusual punishment because petitioner is actually innocent of causing Watkins' death. | |
| Ground 8 | The trial court erred by relying on factors not found by a jury or admitted by petitioner in imposing consecutive rather than concurrent sentences. | |
| Ground 9 | Claims of ineffective assistance of counsel relating to petitioner's mental impairment defense: | |
| | A.  Trial counsel failed to adequately question Dr. Wicks; | |
| | B.  Trial counsel failed to adequately question Dr. Logan; | |
| | C.  Trial counsel failed to call Dr. Heard; and | |
| | D.  Trial counsel failed to call petitioner's acquaintances. | |
| Ground 10 | Trial counsel was ineffective for failing to elicit certain testimony from petitioner regarding the mental impairment defense. | |
| Ground 11 | Trial counsel was ineffective for failing to request a jury instruction on unconsciousness and for failing to argue that theory to the jury. | |
| Ground 12 | Appellate counsel was ineffective for failing to raise the claims listed above on direct appeal. | |

///

**A.    Claims Relating to Sufficiency of the Evidence**

In Ground 4, petitioner argues that there was insufficient evidence of implied malice.  In Ground 5, he argues that there was insufficient evidence that his conduct was the cause

1    of Watkins' death.  When a challenge is brought alleging insufficient evidence, federal habeas

2    corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in

3    the light most favorable to the prosecution, no rational trier of fact could have found proof of

4    guilt beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).[2]  Under

5    Jackson, the court must review the entire record when the sufficiency of the evidence is

6    challenged on habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony,

7    to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.

8    "The question is not whether we are personally convinced beyond a reasonable doubt.  It is

9    whether rational jurors could reach the conclusion that these jurors reached."  Roehler v. Borg,

10   945 F.2d 303, 306 (9th Cir. 1991);  see also Herrera v. Collins, 506 U.S. 390, 401-02 (1993).

11   The federal habeas court determines sufficiency of the evidence in the context of the substantive

12   elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

13                          1.    Evidence of Implied Malice

14                  Petitioner argues that the evidence was insufficient to establish that ". . . he

15   engaged in life-endangering conduct with conscious disregard for human life."  According to

16   petitioner, consumption of methamphetamine rendered him unaware he was driving dangerously

17   and he actually believed taking the drug would make him more alert and a safer driver.  The

18   / / /

19   California Court of Appeal addressed this claim on direct appeal as follows:

20                          Defendant contends the verdicts on counts one and two for second
                     degree murder must be reversed because the evidence of implied malice is
21                   insufficient.  Acknowledging he is responsible for the deaths of Odell and

22   _____

23          [2]    Even though Jackson was decided before AEDPA's effective date, this expression
     of the law is valid under AEDPA's standard of federal habeas corpus review.  A state court
24   decision denying relief in the face of a record establishing that no rational jury could have found
     proof of guilt beyond a reasonable doubt would be either contrary to or an unreasonable
25   application of the law as outlined in Jackson.  Cf. Bruce v. Terhune, 376 F.3d 950, 959 (9th Cir.
     2004) (denying habeas relief on sufficiency of the evidence claim under AEDPA standard of
26   review because a rational jury could make the finding at issue).

                                             11

1    Watkins, he asks this court to reduce the two convictions to vehicular
     manslaughter with gross negligence . . . and remand for resentencing. . . .
2

3    The court then outlined state law with respect to sufficiency of the evidence and implied malice in

4    the context of deaths resulting from driving while under the influence.  Specifically, under

5    California law, implied malice exists where the defendant is found to have acted wantonly and

6    with conscious disregard for human life.  See People v. Sanchez, 86 Cal. App. 4th 970, 975-76

7    (3rd Dist. 2001); People v. Watson, 30 Cal. 3d 290, 300-301 (1981).  A finding of implied malice

8    requires a determination that the defendant actually appreciated the risk involved.  See Watson,

9    30 Cal. 3d at 297.  A defendant's previous encounters with the consequences of reckless driving

10   "sensitize[] him to the dangerousness of such life-threatening conduct."  People v. Ortiz, 109 Cal.

11   App. 4th 104, 112 (1st Dist. 2003).  As to the evidence in this case, the Court of Appeal stated:

12          Here the evidence shows defendant got behind the wheel of his
     Acura while under the influence of methamphetamine and entered Highway
13   160 going the wrong direction, causing another driver to pull off the on-
     ramp to avoid a collision.  Nevertheless, he continued on at a high speed,
14   passing at least two other drivers.  Shortly thereafter, he collided with
     another car after both drivers swerved and then collided with a third car.
15   By swerving, defendant demonstrated he was not asleep at the wheel and
     was conscious of the dangerous consequences of his driving.
16          The jury could also reasonably find defendant knew he was under
     the influence of the drug when he got behind the wheel.  He admitted he
17   was a methamphetamine addict and a frequent user of the drug.  Blood
     analysis disclosed that at the time of the collision, he had more than twice
18   the maximum amount of methamphetamine in his blood than would be
     found in a person who used the drug for therapeutic purposes.
19          Contrary to defendant's claim, there is substantial evidence to
     support the jury's finding he was subjectively aware his conduct was
20   dangerous to human life.  (citation omitted).  He attended a residential drug
     treatment program in 1999 and then attended NA meetings.  It is
21   reasonable to assume he learned about the dangers of taking
     methamphetamine and driving under its influence.  Any uncertainty on that
22   issue was certainly dispelled in 2002 when defendant drove his truck while
     under the influence of methamphetamine and collided head-on with another
23   truck on Bradshaw Road, causing significant bodily injury to the other
     driver and himself.
24          In combination, these events establish that by the time of the fatal
     collision on July 20, 2003, defendant was subjectively aware that driving
25   recklessly while under the influence of methamphetamine is dangerous to
     human life.
26          Nevertheless, defendant surmises that he "might not have known he

12

was endangering anyone on 7-20-03."  More specifically, he argues "it is possible" that on July 6, 2002, he collided with Estes' truck because he was asleep at the wheel (footnote omitted) and therefore learned from that accident that he should take another dosage of methamphetamine before driving to prevent himself from falling asleep in the future; that he did just that on July 20, 2003, in the honest but mistaken belief the methamphetamine would cause him to be alert, improve his ability to drive safely, and avoid endangering anyone, and that after doing so, his mind was so disordered he did not know he was speeding, driving on the wrong side of the road, or endangering anyone.

Unsupported by the evidence and contrary to common sense, this line of reasoning is nothing more than conjecture and speculation.  As such, it is inadequate to support a verdict (citation omitted), much less to overturn one.

As we have concluded, based upon defendant's admitted frequent use of and addiction to methamphetamine, his participation in a drug treatment program, repeated warnings by family and friends, and the 2002 collision, the jury could reasonably find he was subjectively aware at the time he got behind the wheel on July 20, 2003, that driving recklessly while under the influence of methamphetamine was dangerous to human life.  We therefore reject his claim.

As the state court observed, petitioner's logic is completely contrary to all common sense.  After the 2002 collision, in which both petitioner and another person were seriously injured after he caused an accident while under the influence of methamphetamine, it is unfathomable that petitioner would claim that he did not know at the time of the 2003 accident that driving while under the influence of methamphetamine is extremely dangerous.  There is simply no evidence to support petitioner's contention that he was asleep at the wheel in 2002. Petitioner admits that he was driving while under the influence of methamphetamine at the time of the 2003 collision.  In fact, he states that he took a higher dose of the drug in order to stay alert and improve his driving ability, despite having participated in Narcotics Anonymous and a treatment program where he no doubt was instructed to the contrary.

///

Additionally, petitioner's act of swerving to avoid a collision demonstrates that he was actually aware that he was driving dangerously.  In other words, had he really believed that he was driving safely, and in the absence of any evidence that the driver of the car he swerved to

1   avoid was driving recklessly, petitioner would not have had any reason to swerve.  Further, the

2   evidence shows that, prior to swerving, his driving (in the wrong direction and at a high rate of

3   speed) had caused another car to take evasive action to avoid a collision.  It is simply

4   inconceivable that petitioner did not know he was driving recklessly on July 20, 2003.

5           This court agrees with the state court that there was sufficient evidence upon

6   which any rational juror could reach the conclusion that petitioner was actually aware that his

7   conduct in 2003 was dangerous to human life.  Therefore, the state court's determination of this

8   claim was neither contrary to nor an unreasonable application of clearly established law

9                   2.      Evidence of Cause of Watkins' Death

10          Petitioner observes that Watkins suffered several pre-existing conditions, including

11  diabetes and hypertension.  He also notes that she did not die until nearly one month following the

12  collision on July 20, 2003.  According to petitioner, Watkins suffered head trauma, fractured ribs,

13  and a blood clot at a result of the collision and that these problems were all healing.  He argues

14  that there was insufficient evidence to support the conclusion that the collision caused the

15  complications which ultimately caused her death.  This claim was rejected with comment by the

16  California Supreme Court.

17          As respondent notes, under California law a defendant is considered the proximate

18  cause of the victim's death if his act was a substantial factor contributing to the death.  See People

19  v. Briscoe, 92 Cal. App. 4th 568, 583-84 (1st Dist. 2001).  In the context of murder, an act which

20  sets in motion a chain of events that produces the victim's death as a direct, natural, and probable

21  consequence of the act, and without which the death would not have occurred, is considered the

22  proximate cause of the death.  See People v. Fiu, 165 Cal. App. 4th 360, 371 (1st Dist. 2008).  In

23  this case, and as discussed above, the evidence was sufficient to establish that petitioner's actions

24  on July 20, 2003, caused the collision in which Watkins sustained multiple serious injuries.  The

25  question is whether the chain of events following the collision was the direct, natural, and

26  probable consequence of petitioner's conduct.

                                        14

1    During her hospitalization, Watkins developed a pulmonary embolism and

2  eventually suffered a heart attack.  Subsequently, she developed complications and eventually

3  died.  Dr. Super, a trained pathologist, performed an autopsy to determine the cause of death.  Dr.

4  Super concluded that Watkins died as a result of complication related to blunt force head and

5  thoracoabdominal injuries.  The doctor also concluded that Watkins' pre-existing conditions were

6  aggravated by the injuries sustained in the automobile collision on July 20, 2003.

7    The evidence amply establishes Dr. Super's qualifications as an expert pathologist

8  who had performed thousands of autopsies to render an opinion as to the cause of Watkins'

9  death.[3]  Based on Dr. Super's testimony, a rational juror could reasonably conclude that

10  petitioner's conduct, which undeniably caused the collision, was the proximate cause of Watkins'

11  death.  Specifically, Dr. Super stated that the complications which were the direct cause of

12  Watkins' death were the result of the trauma she sustained in the collision, which aggravated

13  Watkins' pre-existing problems.  A rational juror could conclude from Dr. Super's testimony that

14  Watkins' pre-existing conditions would not have been complicated, but for the auto collision.  A

15  rational juror could also conclude that the complications resulting from aggravation of Watkins'

16  pre-existing problems were the natural, direct, and probable consequences of petitioner's conduct,

17  and that Watkins' death would not have occurred absent petitioner's conduct.

18    While it may be true that Watkins would not have died if she had not suffered

19  various pre-existing conditions, the evidence is sufficient to establish that petitioner's conduct set

20  in motion a chain of events leading to Watkins' death.  Specifically, defendant drove under the

21  influence of methamphetamine and caused an auto collision to occur, which in turn aggravated

22  Watkins' pre-existing conditions, which in turn resulted in complications, which in turn resulted in

23  death.  On this record, the court cannot say that the state court's silent denial of this claim was the

24  result of an objectively unreasonable application of clearly established law.

25

26    [3]    Any argument that Dr. Super was not qualified to render an expert opinion is
simply not supported by the evidence.

1 **B.    Claims Relating to the Jury**

2          In Ground 1-A through 1-E, petitioner asserts various claims of trial court error

3 with respect to the court's handling of the jury during deliberations.  In Ground 2, petitioner

4 asserts juror misconduct.

5          1.    Jury Deliberations

6          The Court of Appeal addressed petitioner's claims relating to jury deliberations on

7 direct review, summarizing them as follows:

8          Defendant contends his two murder convictions must be reversed
           as a result of several procedural errors made during deliberations.  He
9          argues that these errors occurred when the trial court improperly
           interrupted deliberations without good cause, allowed the jury to be
10         separated after deliberations began, failed to discharge the jury when one
           juror refused to appear in the courtroom while the verdicts on three counts
11         were read, and failed to admonish the jurors not to discuss the case when it
           excused the jury for the evening.

12

13 The state court then recited the following factual background:

14         The jury began deliberations on September 29, 2004, shortly after
           3:45 p.m.  When the jurors were excused for the evening, the jury advised
15         the court it had reached a verdict on count five.  The matter was continued
           to the following date.
16         Deliberations resumed on September 30, 2004, at 9:08 a.m.  At
           9:36 a.m., the jury advised the court it had reached a verdict on count four.
17         At 10:55 a.m., the jury advised the court it had reached a verdict on count
           three.  Deliberations resumed with scheduled breaks and at 3:40 p.m., the
18         trial court instructed the clerk to contact counsel and the alternate jurors
           and direct them to appear in court to read the verdicts on counts three,
19         four, and five.  The court stated it would take those verdicts because it was
           the end of the day and they were not sufficiently related to counts one and
20         two to interfere with deliberations.
           Upon their return, all jurors were present except Juror No. 10, who
21         remained in the hallway.  The court advised the jury it was going to take
           the sealed verdicts in an abundance of caution since they were submitted to
22         the court and would not interfere with deliberations on counts one and
           two.  However, Juror No. 10 was refusing to return to the courtroom and
23         the court instructed the bailiff to ask the juror to come inside.  The court
           continued its advisement to the jury, stating for purposes of efficiency, its
24         usual practice was to take verdicts that have been rendered although it did
           not have to do so and it did not want to intrude into the jury's
25         deliberations.  However, because Juror No. 10 was not in the courtroom,
           the court advised the jury it was going to send them home and they could
26         resume deliberations the following morning.  The jury was then excused for

the evening.  The court did not read the verdicts.

However, after the jury was excused, the court asked the bailiff to inform it of any exchange he had with Juror No. 10 apart from any matter relating to deliberations.  The bailiff explained that he directed Juror No. 10 to step inside but the juror did not answer and appeared slightly disoriented and unresponsive to questioning.  The juror was looking for something in the newspaper and continued to do so but the juror did not say anything about deliberations.

The court indicated that it was inclined to let the matter go but asked counsel for advice on how to proceed.  The prosecutor indicated he did not think they could ignore the matter.  Defense counsel took the position the jury should be sent home and when they reconvened in the morning, the court should ask them if everyone was feeling alright and whether they were ready to work.  If anyone answered in the negative, they should be heard at that time.

The court was then advised that the jurors were waiting outside.  They had told the bailiff Juror No. 10 seemed disoriented and they asked whether they could go back into the jury room to talk to him.  Juror No. 10 was still refusing to come into the courtroom, so the parties agreed to call the presiding juror, Juror No. 8, to see if he or she could shed some light on Juror No. 10's conduct and whether he needed assistance.  Juror No. 8 was ushered into the courtroom and advised by the court that it "cannot and must not know anything about your deliberations."  The court then asked the juror whether he had any concerns about Juror No. 10.  Juror No. 8 indicated that until that point he had no concerns.  He explained that some of the jurors were taken off guard when the bailiff knocked on the jury room door prior to 4:30 p.m. and called them back into court "not knowing they were going to be coming back in here to do the counts that had already been decided."  It was only when Juror No. 10 refused to return to the courtroom that some of the jurors became concerned.  When the court asked Juror No. 8 if the jury still wanted to return to the jury room at that time, the juror stated "Yes.  And that is why as a group we wanted to go back in to the deliberation room because that is the only place where we have been instructed where we could talk. . . ."  At 4:21 p.m., after both parties agreed, the court granted the jurors' request.  About 30 minutes later, at the jury's request, it was allowed to go home for the evening.

The jury resumed deliberations without incident the following morning.  The bailiff advised the trial court that when he went to secure the jury that morning, Juror No. 10 spontaneously stood up and apologized for what occurred the day before.  The juror stated that he did not know what happened and that he was sorry he held up the court.  There was no further communication and the bailiff left.

///

Around noon of that same day, the jury advised the court it had reached verdicts on counts one and two.  After the lunch recess, all five verdicts were read by the court.  All jurors were present when the verdicts were read, each juror was polled separately as to counts one and two, and each affirmed that the verdicts on those two counts were their true verdicts.

1

2          Initially, the court observes that petitioner's claims relating to jury deliberations are

3   primarily based on alleged errors of state law.  A writ of habeas corpus is available under 28

4   U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts.  See

5   Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195,

6   1197 (9th Cir. 1983).  It is not available for alleged error in the interpretation or application of

7   state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir.

8   1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be

9   utilized to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

10          However, a "claim of error based upon a right not specifically guaranteed by the

11  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

12  infects the entire trial that the resulting conviction violates the defendant's right to due process."

13  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

14  Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

15  claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

16  miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

17  F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

18          With these general principles in mind, the question on each of petitioner's claims

19  relating to jury deliberations is whether the alleged error violated due process.

20          Referencing the events of September 30, 2004, petitioner argues that the trial court

21  improperly interrupted deliberations to take the verdicts on counts three, four, and five.  Given

22  that the trial court never looked at the verdicts and the jury resumed deliberations on the

23  remaining counts before any verdicts were read, the court cannot see any prejudice in the trial

24  court's conduct.  Contrary to petitioner's argument that the trial court's conduct was

25  unauthorized, California law permits the trial court to receive and record a sealed verdict before

26  the jury has finished deliberating on all counts.  See People v. Hernandez, 163 Cal. App. 3d 645,

657 (2nd Dist. 1985).  Further, nothing in the interruption of deliberations in this case raised a risk

of influencing any of the verdicts – the jury had already reached verdicts on counts three, four,

and five before the interruption, and counts one and two were unrelated.[4]  On this record, the

court cannot say that the state court's denial of this claim was either contrary to or an

unreasonable application of any clearly established law.

        Next, petitioner argues that the trial court improperly allowed Juror No. 10 to

remain separated from the rest of the jury when he refused to return to the courtroom on

September 30, 2004.  In the state court, petitioner claimed this violated California Penal Code

§ 1128, which requires that an officer of the court must be sworn to keep the jury ". . . together

for deliberation. . . ."  The Court of Appeal addressed this claim on direct review and concluded

that petitioner had procedurally defaulted by not raising a contemporaneous objection.  Assuming

without deciding that the claim is not procedurally barred in this court, the claim lacks merit.  The

plain language of § 1128 only requires that the jury be kept together during deliberations.  Here,

the record is clear that Juror No. 10 was separated from the rest of the jury only during times

when the jury was not in deliberations and that the jury was together at all times they were

_____

        [4]        To the extent petitioner claims that members of the jury were under the false belief
that they had to render verdicts each day they deliberated, that issue is addressed in the Court of
Appeal's decision at footnote 8 as follows:

                According to counsel, Juror No. 2 believed the jurors had to return
        a verdict every day because the court called them back into court to read
        the verdicts at the end of the first whole day.  There was nothing in the
        court's instructions or procedures that compelled this conclusion. . . .
        [A]lthough the court told the jury it was going to read the verdicts on
        counts three, four, and five before the jury had finished deliberating on
        counts one and two, in fact it did not do so.  Moreover, the court advised
        the jury that it did not have to follow that procedure and it did not want to
        interfere with the jury's deliberations.  In its charge to the jury, the court
        properly instructed on the procedures for deliberating and returning
        verdicts.  In sum, there was nothing improper in the court's instructions or
        prejudicial in the procedure that was followed.

This court agrees with the Court of Appeal's analysis.  In particular, the trial court's instructions
as a whole were sufficient to dispel any misconception on the part of jurors that they had to reach
verdicts every day.

1    deliberating.[5]  Because there was no violation of state law, there was nothing to rise remotely

2    close to a violation of due process.  The state court's denial of this claim was neither contrary to

3    nor an unreasonable application of any clearly established law.

4           Next, petitioner claims that the trial court erred by not discharging the jury and

5    ordering a new trial after Juror No. 10 refused to return to the courtroom for the reading of

6    verdicts on counts three, four, and five.  In the state court, petitioner argued that the trial court

7    violated California Penal Code § 1147, which requires that the jury be discharged if all do not

8    appear at the time verdicts are read.  The Court of Appeal concluded that, because no verdicts

9    were read during the time Juror No. 10 refused to appear in the courtroom, no violation occurred.

10   This court agrees and finds that, because there was no violation of state law, there could have

11   been no due process violation.  The state court's denial of this claim was neither contrary to nor

12   an unreasonable application of any clearly established law.

13          Finally, petitioner argues that the trial court failed to admonish the jury not to

14   discuss the case before permitting it to adjourn.  This claim lacks merit because the record reflects

15   that, before the case was submitted to the jury, the jury was instructed not to discuss the case with

16   anyone, including each other, during any type of recess or break and not to deliberate unless all of

17   them were in the jury room together with the door closed.  Petitioner points to nothing to suggest

18   that the jury did not heed this admonition.  The state court's denial of this claim was neither

19   contrary to nor an unreasonable application of any clearly established law.

20   / / /

21          2.    Juror Misconduct

22          The Sixth Amendment guarantees a fair trial by an impartial jury.  See Irvin v.

23   Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg, 895 F.2d 520, 523 (9th Cir.1990).  If even a

24   _____

25          [5]    The court rejects as unsupported by the record and speculative petitioner's
     contention at Ground 1-E that there was a "real possibility" that the jury was not together at all
26   times when it deliberated on September 30, 2004.

1   single juror is "unduly biased or prejudiced" the defendant has been denied his right to an

2   impartial jury.  See Tinsley, 895 F.2d at 523-24.   As to juror misconduct, "[t]he test is whether or

3   not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."

4   United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  On collateral review, if misconduct

5   occurred, a petitioner must show that the alleged error "'had substantial and injurious effect or

6   influence in determining the jury's verdict.'"   Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir.

7   1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); see also Hughes v. Borg, 898

8   F.2d 695, 699 (1990).

9           Petitioner argues that it was possible three jurors committed misconduct and that

10  the trial court erred in refusing to disclose information relating to these jurors.  The Court of

11  Appeal addressed this claim on direct review and outlined the following factual background:

12          On October 1, 2004, the jury returned guilty verdicts on all counts.
        Each member of the jury was then polled separately as to counts one and
13      two and each juror agreed the verdict was his or her "true verdict."
            Prior to excusing the jury, the court advised the jurors they could
14      talk about the case to whomever they wanted, that if they chose, they could
        remain outside the courtroom and speak to counsel, that it was ordering
15      their personal information sealed and if it was sought for any reason, they
        would be notified before the information was disclosed and given an
16      opportunity to object to disclosure.
            On about October 6, 2004, defendant filed a motion to request the
17      address and phone numbers of Juror Nos. 7, 9, and 10.  To establish good
        cause, counsel attached her own declaration in which she relayed the
18      following facts:  Immediately after rendering the verdict, Juror No. 2
        approached her.  The juror was distraught and crying and indicated that the
19      guilty verdict on counts one and two for second degree murder was not her
        true verdict and that she was pressed by other jurors into rendering a guilty
20      verdict.  She believed Juror Nos. 7, 9, and 10 would corroborate her
        statements and desired to interview those jurors regarding potential juror
21      misconduct.  The prosecution opposed the motion.
            At the hearing on the motion, the court set forth the following
22      additional information received from defense counsel in chambers:  Counsel
        spoke to Juror No. 2 in the stairwell where the juror continued to cry.  The
23      juror told counsel she was pressured and the process went too fast.  She
        wanted to vote for manslaughter.  Seeing that the juror was so upset,
24      counsel told her to sleep on the matter and counsel would contact her the
        following Monday.  Counsel obtained the juror's phone number and,
25      noticing that the juror still had her jury badge, suggested that she return the
        badge to the courtroom.  When the juror asked if she should tell the court
26      what had transpired, counsel responded "[d]o whatever you think you

                                            21

should do."

Counsel subsequently met with Juror No. 2 in counsel's office where the juror reiterated that she had been pressured into voting guilty for second degree murder and that she was really distraught and had only slept four hours in the last three nights. She told counsel she was pressured into a guilty verdict because the jurors leading the discussions spoke to her in rude and aggressive ways, because she thought the jury had to reach verdicts every day based on having been called back into court to take the jury's earlier verdicts, and balloting changes from secret ballots to hand voting in order to show she was the only holdout juror. The juror also indicated that the other jurors made charts with pros and cons but would not place her ideas on the chart and asked her "what part of this don't you understand?" Last, she said the other jurors told her she could not use her common life experiences to deliberate.

When the jury was polled, Juror No. 2 did not advise the court that the verdict on either count one or two was not her true and correct verdict because she did not know she could say so. At that time, however, she looked at Juror No. 1 and said "I don't want to go through with this" and that juror said "[d]on't worry about it. It will be all right."

The court added that when the jury was polled, the court observed that Juror No. 2 appeared upset but was not distraught or crying and the court did not notice any other jurors crying at that time. The court also stated that when Juror No. 2 came back into the courtroom to return her badge, she did not say anything to the court or to the bailiff about her change of mind. The court denied the motion finding defendant had failed to establish good cause.

The state court began its analysis of the claim by noting that, under California law, the defendant bears the burden of establishing good cause to unseal juror information. See People v. Rhodes, 212 Cal. App. 3d 541 (3rd Dist. 1989). The Court of Appeal continued its analysis by discussing the good cause requirement and the kinds of evidence admissible to establish good cause:

In Rhodes, . . . the court discussed the competing interests of "maintaining the integrity of our jury system, including encouraging public participation in the process, fostering free and open discussion among jurors, promoting verdict finality, reducing incentives for jury tampering, and discouraging harassment of jurors by losing parties eager to have the verdict set aside." (citation omitted). Striking a middle ground to harmonize and satisfy these interests, the court held that "upon timely motion, counsel for a convicted defendant is entitled to the list of jurors who served in the case, including addresses and telephone numbers, if the defendant sets forth a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (citation omitted).

However, a motion for new trial to overturn the verdict for juror

misconduct may not be based upon a juror's hearsay statement. (citation omitted). Nor may the verdict be impeached with evidence that is inadmissible under Evidence Code section 1150. (citation omitted).

Evidence Code section 1150 provides that "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

The limitation stated in Evidence Code section 1150 "prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under section 1150 to impeach a verdict . . . are those open to sight, hearing, and other senses and thus subject to corroboration." (citations omitted). The rationale behind this rule is to distinguish between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which cannot be corroborated or disproved. (citation omitted).

Applying these rules to petitioner's case, the Court of Appeal stated:

. . . [W]e find no abuse of discretion. First, defendant failed to establish good cause because his showing was based solely on hearsay. (citation omitted). Juror No. 2's statements were presented to the court by way of defense counsel's declaration and oral statements to the court. Counsel had this juror's telephone number and had met with her in counsel's office. Thus, counsel had the ability to obtain the juror's affidavit and failed to do so. Moreover, during polling, Juror No. 2 twice told the court the verdicts on counts one and two were her true and correct verdicts. She also failed to advise the court to the contrary despite the fact she had the opportunity to do so when she returned her badge to the courtroom after speaking with defense counsel.

In addition, Juror No. 2's allegations that other jurors spoke in a rude and aggressive manner to her are inadequate as a matter of law to show jury misconduct because they are not of such character as are likely to have improperly influenced her verdict. (citations omitted). . . . Nor may the court consider her statements indicating that she felt pressured to reach a guilty verdict because they relate to the jury's deliberative process and to Juror No. 2's own mental processes and subjective considerations. (citations omitted). Those statements include allegations that she felt pressured because she believed the jury had to return verdicts every day (footnote omitted) and felt social pressure because the jury switched to hand balloting to isolate her and used charts without including her ideas.

Defendant contends, however, that the showing he must make to obtain a new trial on grounds of juror misconduct is greater than the prima facie showing he must make [to unseal juror information]. Under the circumstances of this case, we disagree.

[The statutes governing release of juror information] require the

1
2
3

defendant to make a prima facie showing of good cause . . . .   Good cause is shown by evidence establishing a "reasonable belief that jury misconduct occurred. . . ."   (citation omitted).   In so doing, the defendant must show that a "juror's conduct was 'of such a character as is likely to have influenced the verdict improperly.'"   (citations omitted).

4
5
6

As we have found, defendant failed to make that showing.   The basis for his claim of good cause was to contact other jurors who could corroborate Juror No. 2's statements.   Since we have concluded that [Juror No. 2's] allegations were insufficient as a matter of law to show a reasonable belief that jury misconduct took place, there was no good cause to [unseal juror records to] corroborate her allegations.

7          As to petitioner's primary claim that the trial court erred by refusing to release the

8   sealed information regarding Juror Nos. 7, 9, and 10, this court must agree with the state court

9   that there was no violation of state law.   In particular, as the Court of Appeal outlined, California

10   law requires a showing of good cause which, in turn, can be based on only certain kinds of

11   evidence which can lead to only certain kinds of findings.   Here, petitioner failed to provide any

12   admissible evidence of Juror No. 2's statements.   And, even if he had, Juror No. 2's statements

13   could not, as a matter of California law, have led to the reasonable belief that misconduct took

14   place because they related exclusively to subjective considerations.   Because no error of state law

15   occurred with respect to the release of sealed juror information, there was nothing which rose to

16   the level of a violation of due process.[6]

17          The state court rejected as speculative petitioner's additional argument that other

18   jurors "might be able to furnish relevant facts which Juror 2 could not furnish."   This court agrees

19   that such an argument is based on pure speculation and, for this reason, finds that the state court's

20   rejection of the argument was neither contrary to nor an unreasonable application of any clearly

21   established law.

22

23          The state court also rejected petitioner's assertion that the failure to hold a hearing

24   at which Juror Nos. 7, 9, and 10 could object to disclosure of their information violated his right

25

26          [6]          The court need not consider whether any juror misconduct resulted in an unfair trial because petitioner has not established that any misconduct ever occurred.

1   to due process because he was denied important procedural guarantees.  The Court of Appeal

2   reasoned that the hearing to object to disclosure of juror information is a post-trial procedural

3   mechanism and, as such, does not impact the fairness of the trial or resulting verdict.  This court

4   agrees and also finds that, because the hearing provides an opportunity for jurors to object to

5   disclosure of sealed information, the mechanism does not provide any procedural protection to

6   petitioner – the mechanism protects jurors.  The state court's denial of this assertion was neither

7   contrary to nor an unreasonable application of any clearly established law.

8       C.    **Jury Instruction Claim**

9           In Ground 3-A, petitioner argues that the jury instruction regarding implied malice

10  was erroneous.  In general, to warrant federal habeas relief, a challenged jury instruction "cannot

11  be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

12  process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

13  (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

14  must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

15  conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

16  414 U.S. at 147).  In making its determination, this court must evaluate an allegedly ambiguous

17  jury instruction "'in the context of the overall charge to the jury as a component of the entire trial

18  process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

19  1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

20  'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

21  way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

22  U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

23  instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  Where an instruction is missing a

24  necessary element completely, the "reasonable likelihood" standard does not apply and the court

25  may not ". . . assume that the jurors inferred the missing element from their general experience or

26  from other instructions. . . ."  See Wade v. Calderon, 29 F.3d 1312, 1321 (9th Cir. 1994).  In the

25

1  case of an instruction which omits a necessary element, constitutional error has occurred.  See id.

2          It is well-established that the burden is on the prosecution to prove each and every

3  element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

4  (1970).  Therefore, due process is violated by jury instructions which use mandatory

5  presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

6  See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

7  (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

8  fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

9  permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

10 from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

11 (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

12 instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

13 by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

14 re Winship, 397 U.S. at 364).

15         Even if there is constitutional error, non-structural errors may be harmless.  See

16 Hedgpeth v. Pulido, 129 S.Ct. 530, 532 (2008) (per curiam) (citing Chapman v. California, 386

17 U.S. 18 (1967)).  In the context of jury instructions, an error is not structural so long as the error

18 does not "vitiat[e] all the jury's findings."  Sullivan v. Louisiana, 508 U.S. 275, 2781 (1993)

19 (holding that an erroneous reasonable doubt instruction resulted in structural error not subject to

20 harmless error analysis).  An instructional error which resulted in omission of an element of the

21 offense was a trial error subject to harmless error review.  See Hedgpeth, 129 S.Ct. at 532 (citing

22 Neder v. United States, 527 U.S. 1 (1999)).  An erroneous aider and abettor instruction is also

23 not structural.  See id. (citing California v. Roy, 519 U.S. 2 (1996) (per curiam)).  A jury

24 instruction which misstates an element of an offense is also not structural.  See id. (citing Pope v.

25 Illinois, 481 U.S. 497 (1987)).  An erroneous burden-shifting instruction is also not structural.

26 See id. (citing Rose v. Clark, 478 U.S. 570 (1986)).  Finally, an instruction on multiple theories of

26

1    guilt where one of the theories is improper does not result in a structural error requiring automatic

2    reversal, but is error subject to harmless error analysis.  See id.

3           In Chapman, a case before the Supreme Court on direct review, the Court held

4    that "before a [non-structural] constitutional error can be held harmless, the court must be able to

5    declare a belief that it was harmless beyond a reasonable doubt."  386 U.S. at 24.  A different

6    harmless error standard applies to cases on collateral review.  In Brecht v. Abrahamson, the Court

7    stated that applying the Chapman standard on collateral review "undermines the States' interest in

8    finality and infringes upon their sovereignty over criminal matters."  507 U.S. at 637.  The Court

9    also noted that the Chapman standard is at odds with the historic meaning of habeas corpus –

10   which is meant to afford relief only to those who have been grievously wronged – because it

11   would require relief where there is only a reasonable possibility that a constitutional error

12   contributed to the verdict.  See id.  Therefore, in habeas cases, the standard applied in Kotteakos

13   v. United States, 328 U.S. 750 (1946), governs harmless error analysis for non-structural

14   constitutional errors.  See Brecht, 507 U.S. at 637.  Under this standard, relief is available where

15   non-structural error occurs only where such error "had a substantial and injurious effect or

16   influence in determining the jury's verdict."  Kotteakos, 328 U.S. at 776.

17          The Court of Appeal addressed petitioner's jury instruction claim on direct appeal

18   as follows:

19          Defendants contends the trial court misled the jury when it gave an
            erroneous jury instruction that expanded the definition of malice.
20          Respondent argues that this claim was waived and that the jury was not
            misled in light of the entire instructional charge. . . .
21

22   The court began its analysis by explaining that the trial court instructed the jury on the definition

23   of murder under CALJIC No. 8.10 and on the definition of malice under CALJIC No. 8.11.

24   / / /

25   Under CALJIC No. 8.10, the trial court instructed:

26          The defendant is accused in Counts 1 and 2 of having committed

                                                    27

the crime of murder, a violation of Section 187 of the Penal Code.  Every person who unlawfully kills a human being with malice aforethought is guilty of the crime of murder in violation of Penal Code Section 187.  A killing is unlawful, if it is not justifiable nor excusable.

In order to prove this crime, each of the following elements must be proved:  One, a human being was killed.  Two, the killing was unlawful, and three, the killing was done with malice aforethought.

Under CALJIC No. 8.11, the trial court instructed:

Malice may be either express or implied.  Malice is express when there is manifested an intention unlawfully to kill a human being.  Malice is implied when one, the killing resulted from an intentional act, two, the natural consequences of the act are dangerous to human life, and three, the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.

When it is shown that a killing resulted from the intentional doing of an act with express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought.  The mental state constituting malice aforethought does not necessarily require any ill will or hatred of the person killed.

The word aforethought does not imply deliberation or the lapse of considerable time.  It only means that the required mental state must precede rather than follow the act.

The trial court also gave the following special instruction on malice aforethought:

. . . When a person with wanton disregard for human life does an act that involves a high degree of probability that it will result in death to someone else . . . he acts with malice aforethought.  Malice is evidenced by circumstances indicating that the killing was proximately caused by an act, the natural consequences of which are dangerous to human life which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with disregard of the danger.

In the mental state of malice aforethought, there is an element of viciousness, an extreme indifference to the value of human life.  It is where a person, free from any mental impairment or not acting in the heat of passion or on adequate provocation, makes a voluntary choice to commit a person-endangering act.

The Court of Appeal observed that petitioner agreed to this special instruction at time of trial and, therefore, waived any claim that the instruction was erroneous.   Despite the procedural default of not raising a contemporaneous objection to the special instruction, the Court of Appeal addressed the merits of the claim as follows:

Defendant takes issue with the last sentence of the special instruction where the word "or" appears between the phrases "free from any mental impairment" and "not acting in the heat of passion or on adequate provocation." Defendant argues that because the instruction was worded in the disjunctive rather than the conjunctive, the jury was erroneously instructed it could find he acted with implied malice even if it found he was mentally impaired as long as it found he did not act in a heat of passion or with adequate provocation. In other words, the jury could disregard any mental impairment defendant suffered despite its finding he was under the influence of methamphetamine. We disagree.

Implied malice may be negated by proof the defendant acted upon a sudden quarrel or heat of passion or sufficient provocation. (citations omitted). It may also be negated by evidence of mental disease, defect, or disorder. (citations omitted). Thus, there are three alternative theories that may negate a finding of implied malice and any one of them may defeat that finding. It was therefore proper to use the disjunctive . . . . (citation omitted).

Moreover, the correctness of a jury instruction is determined from the entire charge, not from a particular instruction or part of an instruction. (citation omitted). Instructional error may not be predicated on the appearance of a verbal inaccuracy that appears in some part of an instruction. (citation omitted).

Here, the jury was properly instructed in the standard definition of malice (CALJIC No. 8.11), the necessity of finding the requisite mental state (CALJIC No. 3.31.5), and defendant's mental defense (CALJIC No. 3.32). These instructions effectively informed the jury that defendant's alleged mental impairment could eliminate the mental state required for second degree murder. Moreover, defense counsel spent a great deal of time arguing that defendant's mental disabilities prevented him from subjectively appreciating the risk of his conduct. (footnote omitted). Given these instructions and argument by counsel, the jury was clearly informed that a defendant's mental disabilities could negate malice aforethought. We therefore conclude there was no prejudicial instructional error.

As the Court of Appeal observed, under California law malice aforethought may be negated for any one of three reasons: (1) mental impairment; or (2) heat of passion; or (3) adequate provocation. The special instruction, as given to the jury in this case, correctly instructed the jury on each of these three reasons, using the disjunctive "or" to indicate that any one of the reasons could negate malice. Further, there was no possibility that the jury could have believed that it could find malice even if there was proof of mental impairment because the jury was separately instructed that mental impairment negated the required mental state for murder. Finally, petitioner's counsel competently argued the mental impairment defense. For these

1   reasons, the court cannot say that there was any instructional error and, even if there was, it was

2   harmless because it could not have had a substantial and injurious effect on the jury's verdict.  The

3   state court's adjudication of this claim was neither contrary to nor an unreasonable application of

4   clearly established law.

5   **D.    Claims Related to the Sentence**

6              In Ground 7, petitioner argues that his sentence constitutes cruel and unusual

7   punishment because he is actually innocent of causing Watkins' death.  In Ground 8, petitioner

8   claims that the trial court erred by imposing concurrent rather than consecutive sentences because

9   the court relied on aggravating factors which were neither admitted nor proved beyond a

10  reasonable doubt.

11             1.    Cruel and Unusual Punishment

12             Petitioner contends that his sentence of 32 years to life, plus eight months,

13  constitutes cruel and unusual punishment, in violation of the Eighth Amendment, because he is

14  actually innocent of causing Watkins' death.  In Lockyer v. Andrade, the Supreme Court

15  concluded that habeas relief was not available on a claim that two consecutive sentences of 25

16  years to life in prison constituted cruel and unusual punishment because there is no clearly

17  established Supreme Court precedent.  See 538 U.S. 63, 72.  The Court stated:

18                    Our cases exhibit a lack of clarity regarding what factors may
                      indicate gross disproportionality. . . .  [¶] Thus . . . the only relevant clearly
19                    established law amenable to the "contrary to" or "unreasonably application
                      of" framework is the gross disproportionality principle, the precise
20                    contours of which are unclear, applicable only in the "exceedingly rare" and
                      "extreme" case.
21
22             Id. at 72-73.

23  Thus, unless the case presents the "exceedingly rare" or "extreme" situation, application of the

24  gross disproportionality principle is unclear and, for this reason, habeas relief is not available.  Cf

25  Gonzalez v. Duncan, __ F.3d __ (9th Cir. Dec. 30, 2008) (applying the gross disproportionality

26  principle to term of years sentence to grant habeas relief only because the case presented the

1    "exceedingly rare" and "extreme" situation).

2    The question is whether the facts of petitioner's case present the "exceedingly

3    rare" and "extreme" situation where the gross disproportionality principle could be applied as

4    clearly established law.  For at least two reasons, the court finds that petitioner's case does not

5    present such a situation.  First, as discussed above, the evidence was sufficient for the jury to

6    conclude that petitioner's conduct was the proximate cause of Watkins' death and petitioner has

7    presented nothing remotely close to an actual innocence case.  The court cannot say that a term-

8    of-years sentence of 32 years and eight months is extreme in any way for two counts of second

9    degree murder.  Second, even assuming petitioner did not cause Watkins' death, the sentence

10   imposed is not extreme for one count of second degree murder given petitioner's history of

11   driving while under the influence of methamphetamine and his continued disregard for the

12   associated risks to human life.  Because this case does not present the exceeding rare situation,

13   there is no clearly established law and habeas relief is unavailable.

14                2.    Imposition of Consecutive Sentences

15                In Apprendi v. New Jersey, 530 U.S. 466 (2000), and Blakely v. Washington, 542

16   U.S. 296 (2004), the Supreme Court held that the Sixth Amendment requires that any fact – other

17   than a prior conviction – that exposes a defendant to a sentence in excess of the relevant statutory

18   maximum must be found by a jury beyond a reasonable doubt, and not by a judge by a

19   preponderance of the evidence.  Petitioner contends that the imposition of consecutive sentences

20   in his case violates this rule.  Specifically, petitioner argues:

21                       The Trial Court relied on aggravating facts and factors not found by
                   the jury to impose consecutive rather than concurrent sentences for the
22                 murder counts. . . .  The Court made its findings by a standard less than
                   beyond a reasonable doubt.
23

24   / / /

25   / / /

26   The California Court of Appeal addressed this claim on direct appeal as follows:

                                            31

1

          It is well established that the rule of Apprendi and Blakely is
    inapplicable to the fact of a prior conviction. . . .  Moreover, the trial court

2

    only considered defendant's prior convictions in its decision to deny
    probation, and that decision does not come within the Apprendi/Blakely

3

    rule because it does not result in a greater sentence than the court could
    otherwise impose.

4

          The Apprendi/Blakely rule is also inapplicable where as here the
    trial court imposed consecutive sentences based not on facts independently

5

    found by the court, but upon facts charged and found true by the jury,
    namely that counts one and two involved different victims and were

6

    committed on a different date from the offense charged in count four.
    Accordingly, because defendant's sentence does not violate the principles

7

    set forth in Apprendi and Blakely, we reject his claim of constitutional
    error.

8

9

          Petitioner's claim is meritless for at least two reasons.  First, the rule of Apprendi

10

and Blakely does not apply to consecutive sentencing schemes which do not involve fact-finding

11

by a judge.  See United States v. Fifield, 432 F.3d 1056, 1066-67 (9th Cir. 2005); see also United

12

States v. Buckland, 289 F.3d 558, 570-71 (9th Cir. 2002).  Second, consecutive sentences in this

13

case were imposed based on the jury's findings that petitioner's crimes occurred on different dates

14

and involved different victims.  Therefore, even if the Apprendi/Blakely rule applied to imposition

15

of consecutive sentences, the rule was not violated in this case because everything required to

16

impose consecutive sentences was found by the jury beyond a reasonable doubt.  For these

17

reasons, the court finds that the state court's denial of this claim was neither contrary to nor an

18

unreasonable application of clearly established law.

19

          E.       Claims of Ineffective Assistance of Counsel

20

          In Ground 1-F, petitioner claims trial counsel was ineffective for failing to object

21

to the jury problems discussed above.  In Ground 3-B, petitioner asserts trial counsel was

22

ineffective for failing to object to the implied malice jury instruction.  In Ground 6-A through    6-

23

D, petitioner raises claims of ineffective assistance of counsel relating to the cause of Watkins'

24

death.  In Grounds 9-A through 9-D, 10, and 11, petitioner argues that trial counsel was

25

ineffective with respect to his mental impairment defense.  In Ground 12, petitioner argues that

26

appellate counsel was ineffective for failing to argue the various issues raised in the instant

1  petition on direct appeal.

2  　　　　The Sixth Amendment guarantees the effective assistance of counsel.  The United

3  States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

4  Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all

5  the circumstances, counsel's performance fell below an objective standard of reasonableness.  See

6  id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have

7  been the result of reasonable professional judgment.  See id. at 690.  The federal court must then

8  determine whether, in light of all the circumstances, the identified acts or omissions were outside

9  the wide range of professional competent assistance.  See id.  In making this determination,

10  however, there is a strong presumption "that counsel's conduct was within the wide range of

11  reasonable assistance, and that he exercised acceptable professional judgment in all significant

12  decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S.

13  at 689).

14  　　　　Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

15  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

16  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

17  reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

18  see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

19  determine whether counsel's performance was deficient before examining the prejudice suffered by

20  the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness

21  claim on the ground of lack of sufficient prejudice . . . that course should be followed."  Pizzuto v.

22  Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

23  / / /

24  / / /

25  　　　　The Strickland standards also apply to appellate counsel.  See Smith v. Robbins, 528

26  U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d

1428, 1433 (9th Cir. 1989).  However, an indigent defendant "does not have a constitutional right
to compel appointed counsel to press nonfrivolous points . . . if counsel, as a matter of professional
judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983).
Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the ability of
counsel to present the client's case in accord with counsel's professional evaluation would be
"seriously undermined." Id.; see also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998)
(counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even
particularly good appellate advocacy.")  Further, there is, of course, no obligation to raise meritless
arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88.  Thus, counsel is not deficient
for failing to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice
in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have
prevailed on appeal.  See id. at n.9.

### 1.    Jury Problems

Petitioner argues that trial counsel was ineffective for failing to object to any of the
alleged errors discussed above regarding jury deliberations.  Because no errors occurred, the result
of the trial would have been the same even had counsel interposed objections.  Any objections
would have been overruled.  Given that there could not have been any prejudice to petitioner by
counsel's failure to interpose objections, the state court's silent denial of this claim was not an
objectively unreasonable application of Strickland.

### 2.    Implied Malice Jury Instruction

Petitioner asserts that trial counsel was ineffective for failing to object to the special
instruction regarding implied malice.  Again, as discussed above, the court finds that no error
occurred because the instructions correctly stated California law.  Therefore, no prejudice could
have resulted from counsel's failure to object.  As with petitioner's claims of ineffective assistance
of counsel relating to alleged jury problems, the state court's silent denial of this claim was not
objectively unreasonable because there could have been no prejudice.

3.   Cause of Watkins' Death

As to Watkins' cause of death, petitioner raises several new arguments in the context of his assertion he received ineffective assistance of counsel.  Specifically, petitioner contends:  (1) trial counsel failed to present evidence regarding Watkins' pre-existing conditions and lack of treatment; (2) trial counsel failed to consult an expert to determine the cause of Watkins' death; (3) trial counsel failed to request that the jury instruction regarding causation be supplemented with instructions regarding supervening causes of death and inadequate treatment; and (4) trial counsel failed to adequately argue issues related to the cause of Watkins' death during closing argument.  These claims were rejected by the state court without comment.  Therefore, this court reviews to determine whether the state court's determination was an objectively unreasonable application of clearly established law.

The focus of petitioner's arguments is that something other than the collision caused Watkins' death.  In particular, petitioner points to Watkins' pre-existing conditions and alleges that Watkins' family refused life-saving surgery and/or life-support.  For the reasons discussed above, the evidence showed that Watkins' pre-existing conditions were aggravated by the collision and that this aggravation of conditions led to Watkins' death.  Contrary to petitioner's assertion, the pre-existing conditions were not themselves the cause of Watkins' death and would not have become life threatening but for the aggravating factor of injuries resulting from the collision caused by petitioner's conduct.

As to lack of life-saving surgery, petitioner has not presented any evidence to show that Watkins' family refused necessary life-saving surgery.  Moreover, there is no evidence that surgery could have saved Watkins.  Even petitioner's own expert witness, Dr. Robert D. Lawrence, opined that the proximate cause of Watkins' death was the July 20, 2003, collision and that "[a]bsent the injuries, she would not have died at this time."  There is no mention in his report, or the report of Dr. Super, that any surgery could have been performed which would have prevented Watkins' death.  Counsel was not ineffective with respect to issues not supported by

35

1    the evidence.

2            As to life-support, the record indicates that Watkins' daughter, who had power-of-

3    attorney at the time of the collision, signed a do-not-resuscitate-order, also known as a DNR.

4    Petitioner appears to contend that, had this order not been signed, Watkins would have lived and

5    concludes that it was the order and not the collision that actually caused Watkins' death.

6    However, this argument misses the point of a DNR order, which is to express the wish that life-

7    saving heroic measures not be taken when the patient knows that death is imminent even if the

8    patient is temporarily resuscitated.  Here, as Drs. Super and Lawrence opined, the trauma

9    Watkins sustained in the collision led to her death.  In other words, the collision resulted in fatal

10   injuries and no amount of resuscitation could have avoided that inevitable result.  Because the

11   DNR order had no effect on the question of the proximate cause of Watkins' death, counsel could

12   not have been ineffective in this regard.

13           Petitioner also contends that trial counsel was ineffective for failing to consult an

14   expert on the cause of Watkins' death.  This claim is belied by the report of Dr. Lawrence, which

15   petitioner attaches to his petition.  The report indicates that Dr. Lawrence was retained by trial

16   counsel to render an opinion on the cause of Watkins' death.  Contrary to petitioner's contention,

17   trial counsel did in fact consult an expert.  Counsel's performance was not deficient simply

18   because the expert rendered an opinion which was not favorable to petitioner's defense.  In fact,

19   by confirming Dr. Super's opinion as to the cause of Watkins' death, trial counsel was able to

20   focus on more persuasive arguments.

21           Next, petitioner asserts that trial counsel was ineffective for failing to request a

22   jury instruction regarding lack of necessary medical treatment and the DNR order.  As discussed

23   above, such an instruction would not have been supported by the evidence.  For this reason,

24   counsel was not ineffective for failing to request the instruction.

25           Finally, petitioner argues that trial counsel failed to adequately argue issues relating

26   to Watkins' cause of death.  This argument lacks merits because it is clear the evidence supported

                                                    36

the conclusion that Watkins' death was proximately caused by the July 20, 2003, collision and nothing else.  There simply were no persuasive arguments to be made with respect to the proximate cause of Watkins' death and counsel made a tactical decision not to focus on this issue in presenting petitioner's case to the jury.  Counsel's performance was not deficient.

For all the reasons discussed above, the court finds that the state court's silent denial of petitioner's claims of ineffective assistance of trial counsel with respect to the cause of Watkins' death was not the result of an objectively unreasonable application of Strickland.

### 4.   Mental Impairment Defense

Petitioner raises four arguments concerning trial counsel's handling of his mental impairment defense:  (1) trial counsel failed to adequately question Dr. Wicks regarding neurological deficits and the effects of methamphetamine use on petitioner; (2) trial counsel failed to adequately question Dr. Logan regarding the effects of methamphetamine use on petitioner; (3) trial counsel failed to call Dr. Heard, who petitioner states would have testified that petitioner ". . . had been binging and was 'amnesiac' and blacked out during the accidents"; and (4) trial counsel failed to call petitioner's acquaintances, who petitioner states told investigators that petitioner ". . . had been binging on meth and not sleeping for days before the 2003 accident."  Petitioner also claims that trial counsel was ineffective for failing to "call petitioner to establish legal unconsciousness" and failing to request a jury instruction on unconsciousness.  These arguments were rejected by the state court without comment.  Therefore, this court reviews to determine whether the state court's determination was an  objectively unreasonable application of clearly established law.

/ / /

/ / /

/ / /

The basis of petitioner's claims is his theory that he "blacked out" due to the effects of methamphetamine and was unconscious at the time of the July 20, 2003, collision and,

therefore, unable to form the required mental state for any crime.  This argument would not have been persuasive as a matter of California law had it been raised.[7]  While unconsciousness can be a complete defense, see People v. Halvorsen, 42 Cal. 4th 379, 417 (2007), People v. Kelly, 10 Cal. 3d 565, 573 (1973), it is no defense when unconsciousness is the result of voluntary intoxication, see People v. Timms, 151 Cal. App. 4th 1292, 1298 (1st Dist. 2007), see also Cal. Penal Code § 22.  By petitioner's own admission, his intoxication in this case was voluntary.  Therefore, even if he had "blacked out," his argument would not have provided any kind of defense.  Trial counsel's performance was not deficient for failing to elicit testimony to support an untenable legal theory.  The state court's denial of these arguments was not the result of an objectively unreasonable application of Strickland.

### 5.    Issues Raised on Direct Appeal

Petitioner argues that his appellate counsel was ineffective because counsel "failed to raise on appeal the issues raised in this petition."  Petitioner, of course, is incorrect as to those issues discussed above which were in fact raised on direct appeal.  As to claims not raised on direct review, petitioner's claims of ineffective assistance of counsel would not have been appropriate on direct appeal.  As to all other claims not raised on direct appeal, such claims lack merit and, therefore, appellate counsel was not ineffective for failing to raise them.  The state court's silent denial of petitioner's claim of ineffective assistance of appellate counsel was not the result of an objectively unreasonable application of clearly established law.

/ / /

/ / /

## IV.  CONCLUSION

Accordingly, IT IS HEREBY ordered that:

---

[7]    Nor would it have been supported by the facts of this case, which clearly show that petitioner swerved to avoid a collision, which he would not have done had he been unconscious.

1           1.      Petitioner's amended petition for a writ of habeas corpus (Doc. 9) is

2  denied; and

3           2.      The Clerk of the Court is directed to enter judgment and close this file.

 

DATED: January 27, 2009

_____
**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE